The undersigned have reviewed the prior Decision and Order of Deputy Commissioner Hedrick based on the record of the proceedings before former Deputy Commissioner Alston and the briefs and oral arguments before the Full Commission. The appealing party has not shown reversible error or grounds to remand for rehearing. The Full Commission makes additional findings of fact and conclusions of law and MODIFIES and AFFIRMS the Decision and Order of the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record, the Full Commission adopts and modifies the findings of fact of the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. On 19 April 1992, Troopers E. L. Melvin and R. J. Hedgepeth were employed by defendant, an agency of the State of North Carolina. At all times relevant to the alleged acts or omissions giving rise to plaintiff's claim, Troopers Melvin and Hedgepeth were acting within the course and scope of their employment with defendant.
2. At the time of the hearing, plaintiff was twenty-nine years old. On 19 April 1992, he was six feet, three inches tall and weighed approximately two hundred seventy-five pounds. Plaintiff was a body builder with a muscular physique.
3. On 18 April 1992, plaintiff, his fiancé, Ms. Burwell, and his two children had traveled from Henderson, North Carolina, to Durham, North Carolina, to assist in planning a wedding. Plaintiff left Durham during the late night hours of 18 April 1992 and arrived near Henderson between midnight and 1:00 a.m. on 19 April 1992. Plaintiff was operating a 1989 Dodge Daytona. His fiancé sat in the passenger seat. His two children sat in the rear seat.
4. As plaintiff was nearing Henderson, he passed Trooper Melvin's cruiser as it traveled in the direction opposite plaintiff. Upon observing plaintiff's vehicle, Trooper Melvin determined that the vehicle was traveling over seventy miles per hour, in violation of the posted speed-limit. Trooper Melvin turned his cruiser around, activated his emergency blue lights and pursued plaintiff's vehicle.
5. Plaintiff stopped his vehicle on the shoulder of the roadway. Trooper Melvin stopped his vehicle behind plaintiff's, exited his vehicle and approached the driver's side of plaintiff's vehicle. Trooper Melvin asked plaintiff to produce his driver's license. Plaintiff complied with the request. Trooper Melvin recognized plaintiff from his driver's license as an individual he had previously cited for a speeding violation. Trooper Melvin stated to plaintiff, "Oh, it's you again Mr. Gregory." Trooper Melvin then asked plaintiff to exit his vehicle. Plaintiff and Trooper Melvin then walked to the rear of plaintiff's vehicle. Trooper Melvin informed plaintiff that he had been stopped for speeding and that this was the second occasion that Trooper Melvin had stopped plaintiff for that reason.
6. Plaintiff became belligerent and argumentative. Plaintiff stated in vulgar terms that he believed he was being harassed. Trooper Melvin asked plaintiff to have a seat in his car and informed him that he was going to issue plaintiff a citation. Trooper Melvin then returned to his cruiser, sat inside, closed the door and began writing the citation. Plaintiff did not return to his car. Rather, he followed Trooper Melvin to his cruiser, approached the driver's side door and asked to see the reading on the trooper's radar detector. Plaintiff then began banging on Trooper Melvin's window. Trooper Melvin cracked his window and asked plaintiff to return to his car and have a seat.
7. Plaintiff refused to return to his car as he had been instructed to do. Instead, he began demanding that Trooper Melvin exit his vehicle. Trooper Melvin continued to write the citation and plaintiff continued to bang on his window. Trooper Melvin then radioed Trooper Hedgepeth and asked him to come to Trooper Melvin's location. While Trooper Melvin was seated, plaintiff told him to get out of his car and plaintiff was "going to throw [his] ass clear across [his] car." Plaintiff continued to act and speak belligerently. He continued to refuse Trooper Melvin's requests and demands to return to his vehicle.
8. Trooper Melvin exited his vehicle and again demanded that plaintiff return to his vehicle. At this time, plaintiff removed a jacket and cap that he was wearing and threw them to the ground. Trooper Melvin then returned to his radio and asked Trooper Hedgepeth to assist him urgently. Ms. Burwell exited plaintiff's vehicle and went to Trooper Melvin's cruiser where Trooper Melvin and plaintiff were standing. Ms. Burwell positioned herself between plaintiff and Trooper Melvin, facing plaintiff. She asked plaintiff to return to the car. At that time, plaintiff began moving forward, toward Trooper Melvin. Believing that plaintiff intended to assault him, Trooper Melvin attempted to move Ms. Burwell from between himself and plaintiff. Plaintiff became irate and demanded that Trooper Melvin not touch his "wife".
9. At that time, Vance County Deputy Sheriffs Lyles and Jones began arriving at the scene in vehicles with blue emergency lights activated. Upon observing the approach of these vehicles, plaintiff returned to his vehicle and sat in the driver's seat with the driver's door open and his feet on the ground. Ms. Burwell also returned to and sat in plaintiff's vehicle. Shortly thereafter, Trooper Hedgepeth arrived on the scene. Trooper Melvin described to Deputy Sheriff Lyles and Trooper Hedgepeth what had occurred. He further informed them that he intended to arrest plaintiff for delaying and obstructing an officer.
10. Troopers Melvin and Hedgepeth then approached plaintiff as he was sitting in his vehicle. Trooper Hedgepeth informed plaintiff that he was being arrested and asked him to step away from his vehicle. Plaintiff stood up but did not move away from his vehicle. He was asked again to step away from the vehicle. When did not do as he was asked, Trooper Hedgepeth reached to grasp plaintiff's arm. As he did so, plaintiff shoved Trooper Hedgepeth. Trooper Hedgepeth then took hold of plaintiff's right arm and Trooper Melvin took hold of his left arm. Plaintiff began struggling with the troopers and using his great arm strength was able to prevent the troopers from gaining physical control over him.
11. The troopers, then assisted by the deputies, began shuffling plaintiff toward the front of a nearby law enforcement vehicle. Plaintiff was pushed onto the hood of the vehicle as the troopers attempted to place him into handcuffs. Plaintiff continued to resist these efforts, holding his arms stiffly to the side and away from his body. Trooper Melvin, Trooper Hedgepeth and Deputy Lyles were unable to force plaintiff's hands behind his back so that he could be handcuffed. Trooper Melvin was afraid that if only one arm was handcuffed, plaintiff would be able to use the handcuffs as a weapon against the officers.
12. Trooper Hedgepeth decided that it would be necessary to force plaintiff to the ground in order to subdue him. Trooper Hedgepeth tripped plaintiff as he and Trooper Melvin maintained their holds on plaintiff's arms. Plaintiff, Trooper Melvin and Trooper Hedgepeth all fell to the ground. Plaintiff's face struck the ground, causing his nose to bleed. The troopers were then able to place plaintiff into handcuffs. Due to the large size of plaintiff's wrists, the handcuffs could only be tightened one notch.
13. After plaintiff had been subdued, he was assisted to his feet and placed into the front passenger seat of Trooper Melvin's cruiser. Trooper Melvin then transported plaintiff to the Vance County Magistrate's Office. After appearing before the magistrate, plaintiff was released into his mother's custody.
14. In the early morning hours of 19 April 1992, plaintiff presented to Maria Parham Hospital where he was evaluated from complaints of right-sided numbness. X-rays were taken. Plaintiff was directed to present to Durham Regional Hospital because there was no neurologist on call at Maria Parham Hospital. Later that morning, plaintiff presented to Durham Regional Hospital where he was evaluated by Dr. Finkel for complaints of dizziness and numbness. Thereafter, plaintiff also received treatment from Dr. Somers for a herniated lumbar disc.
15. Neither Trooper Melvin, Trooper Hedgepeth, Deputy Lyles nor Deputy Jones used a nightstick or flashlight to strike or choke plaintiff while they were effecting his arrest. They did not force his head onto the vehicle hood or the ground. Plaintiff's head only struck the ground when the officers were forced to trip him so that he could be subdued.
16. The force used by Trooper Melvin, Trooper Hedgepeth, Deputy Lyles and Deputy Jones was reasonable considering plaintiff's physical size, his threats of physical harm and his repeated efforts to resist being placed into custody. Further, the officers did not demonstrate the intent to use excessive force in subduing plaintiff.
17. Plaintiff's initial complaint and accompanying affidavit failed to name Trooper Hedgepeth specifically as the negligent officer. However, by Order of former Deputy Commissioner Bernard Alston dated 14 September 1995, plaintiff was permitted to amend the claim, providing the names of the specific troopers involved in the incident.
18. Following the hearing in this matter, Deputy Commissioner Bernard Alston left the employ of the Industrial Commission. By letter dated 31 July 1996, the parties were notified of this circumstance and were given the following options: (1) having the case decided by Special Deputy Commissioner Alston; (2) settling the case; (3) agreeing to have the case mediated; (4) having the case reassigned to another deputy commissioner; or (5) requesting that the case be heard de novo in whole or in part. The case was subsequently reassigned to Deputy Commissioner John A. Hedrick for a final Decision and Order.
19. By letter to Deputy Commissioner Hedrick dated 17 March 1997, counsel for plaintiff proposed the rehearing of certain testimony, but acknowledged that if Deputy Commissioner Hedrick did not deem this necessary, the case was ready to proceed. Neither party voiced any objection to the reassignment of the case to Deputy Commissioner Hedrick, until after the final Decision and Order was filed.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The North Carolina Industrial Commission has jurisdiction over the parties and the subject matter of this action. N.C. Gen. Stat. § 143-291.
2. Defendant's named employees used reasonable force to subdue and arrest plaintiff on 19 April 1992, and demonstrated no intent to use excessive force in making the arrest. Jacksonv. N.C. Dept. of Crime Ctrl. Pub. Safety, 97 N.C. App. 425,388 S.E.2d 770 (1990).
3. Plaintiff did not sustain damages as a result of negligence on the part of defendant's named employees.
 ***********
Based upon the foregoing findings of fact and conclusions of law, Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DISMISSED.
2. Each party shall bear its own costs
 S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, JR. COMMISSIONER
S/ ______________ LAURA K. MAVRETIC COMMISSIONER
RCR:mdg